**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| FRED QUERO | CIVIL NO. |
| **Plaintiff** | |
| v. | PLAINTIFF REQUESTS TRIAL BY JURY |
| LOUIS DEJOY<br>POSTMASTER GENERAL<br>UNITED STATES POSTAL SERVICE. | |
| **Defendant** | |

**COMPLAINT**

TO THE HONORABLE COURT:

COMES NOW the Plaintiff, through the undersigned counsel, who respectfully states, alleges and requests as follows:

**I. PARTIES:**

1.      Plaintiff Fred Quero is of legal age, employee of the United States Postal Service, (USPS) with residence, domicile and postal address in H-3, Las Medusas Street Dorado de Mar, Dorado P.R. 00646. His phone number and email address are, respectively, (787) 415-8575 and tonyquero@gmail.com

2.      Louis DeJoy is the General Postmaster of the United States Postal Service (USPS), which is an independent establishment of the executive branch of the United States of America, created and governed by the Postal Reorganization Act ("PRA"), 39 U.S.C. ss 101-5605.

1

## II. JURISDICTION AND VENUE:

3.      This is a civil action brought pursuant to Title VII of the Civil Rights of 1964, sec

as Amended 42 USC 2000(e) et seq.  as well as the Postal Service Act, 39 USC 101 et seq.

4.      Federal question jurisdiction is invoked pursuant to 28 U.S.C. section 1331 as well

as supplementary or pendent jurisdiction of this court related to state claims in this action of

retaliation and Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000 et.seq., among

other statutes and legal authorities.

5.      Plaintiff lives within the jurisdiction of the Commonwealth of Puerto Rico and

because the unlawful employment practices and violations complained off occurred within the

District of Puerto Rico, proper venue is the United States District Court of Puerto Rico.

## III. PROCEDURAL FACTS OF THE CASE:

6.      At all times relevant to the facts of this complaint, the plaintiff was employed as a

full time Mail Processor Clerk, at the DMDU Annex Facility of the United States Postal Service

located in the Municipality of Cataño, until he was terminated from his employment on September

9, 2022.

7.      On March 22, 2023, plaintiff was reinstated in his employment after an arbitrator

awarded that he was unjustly terminated by defendant USPS.

8.      At all times relevant to the facts of this complaint, Lionel Bonilla, was Supervisor

Duty of Operations (SDO) and acted as first line supervisor of the plaintiff. (SDO Bonilla)

9.      At all times relevant to the facts of this complaint, Hector Rivera was Manager Distribution of Operations (MDO) and direct supervisor of SDO Bonilla. MDO Rivera acted as second line supervisor of the plaintiff.

10.     On June 6, 2022, the plaintiff filed a formal complaint EEO 4G-00600040-22. The allegations were related to a Letter of Warning issued by the USPS on March 8, 2022.

11.     Plaintiff had filed various other EEO's prior to EEO 4G 006-0004-22. and had filed numerous amendments to all of them.

12.     On July 28, 2022, Plaintiff filed formal EEO Complaint of Discrimination in the Postal Service, number 1C-331-0367-22 alleging adverse action (retaliation) for prior EEO activity (EEO 4G 006-0004-22) as well as hostile work environment and disparate treatment.

13.     Plaintiff's supervisors Lionel Bonilla and Hector Rivera were notified of the filing of the EEO 1C-331- 0367-22.

14.     On July 29, 2022, supervisor Lionel Bonilla, with the consent of Hector Rivera, placed plaintiff on Emergency Placement, effective July 29, at 9:50 am until August 03 at 7 00 pm, for alleged conduct encouraging a work stoppage.

15.     On September 9, 2022, supervisor Lionel Bonilla issued the plaintiff a Notice of Removal.  MDO Hector Rivera concurred with the notice of removal.

16.     On September 12, 2022, EEO 1C-007-0007-21 was amended by plaintiff to include that the USPS had retaliated against the plaintiff, again, when on September 9, 2022, plaintiff was terminated from his employment.

3

17.     On March 20, 2023, the USPS rendered his Final Agency Decision dismissing EEO 1C-331-0367-22, advising Plaintiff of his right to file a Civil Action within 90 calendar days of the receipt of the Postal Office final decision.

18.     This complaint is filed on this date, which is within the 90 days allowed by the regulation to file a civil claim before this Honorable Court.

19.     Plaintiff had exhausted his remedies under the EEO procedures for case 1C-331-0367-22 (retaliation).

### IV. FACTS:

20.     On August 4, 2011, Plaintiff Fred Quero started working for the USPS, under contract, as a Postal Support Employee (PSE) at the General Post Office in San Juan, Puerto Rico.

21.     On November 2014 approximately, plaintiff became a regular employee of the USPS and started his duties as Mail Processing Clerk at the DMDU Annex Facility in Cataño, Puerto Rico and kept his job until he was wrongful terminated by defendant on September 9, 2022.

22.     Some point in time around year 2015, plaintiff started to participate as a shop steward for the American Postal Workers Union, Puerto Rico Area Local 1070 (APWU PR-1070)

23.     Plaintiff had been a postal shop steward since that date.

24.     A steward's responsibility is to hold the rights of bargaining unit employees under the Collective Bargaining Agreement (CBA). To accomplish this goal, the law allows the steward to assume the status of an equal when dealing with management.

4

25.     Sections 7 and 8(a) (1) of the National Labor Relations Act provides a safeguard against employer retaliation for statements made during grievance procedures Therefore, while acting as a steward, the steward is protected by immunity from discipline based on his/her conduct.

26.      On June 6, 2022, the plaintiff filed a formal complaint EEO 4G-00600040-22. The allegations were related to a Letter of Warning issued by the USPS to plaintiff on March 8, 2022.

27.     Plaintiff had filed various other EEO's prior to EEO 4G 006-004-22 and some of them were pending of resolution when plaintiff filed EEO 4G-006-0004-22.

28.     SDO Bonilla was aware of plaintiff participation in the EEO process against USPS prior to the removal letter he gave plaintiff.

29.     MDO Rivera was aware of plaintiff participation in the EEO process against the USPS prior to the removal letter he concurred with.

30.     While the above referred EEO 4G-006-0004-22 was pending of resolution, a series of incidents regarding safety of the employees, compelled plaintiff, as shop steward, to intervene with management officials to preserve the safety as well as to protect the health of the employees.

31.     At the time these incidents took place, SDO Bonilla was the first line supervisor of the plaintiff while MDO Héctor Rivera was the second line supervisor of the plaintiff.

32.     The incidents started when, on July 28, 2022, management assigned four (4) employees of the USPS to work under the Automated Parcel and Bundle Sorter (APBS).

33.     The APBS is a mechanical sorter machine consisting of several components which final purpose is to sort all mail into the different mailing routes of distribution for all PO Postal Offices in Puerto Rico.

34.    The daily process of sorting the mail starts when a truck filled with mail to be distributed to all postal offices in Puerto Rico arrives at a platform and is received by several mail handlers employees.

35.    The mail handlers remove the locks, ties and strip labels of the truck and get the mail out of the truck to dump them into different pouches and sacks known commonly as yellow dumping sacks.

36.    Each mail handler takes the yellow dumping sack to an input conveyor belt known as the LMS conveyor belt (LMS). The LMS conveyor runs parallel to the floor at a height of little more than five feet.

37.    The LMS conveyor transports each piece of mail to what is known as Inclined Conveyors, which is the first component of the APBS machine.

38.    There are four Inclined Conveyors.

39.    Each Inclined Conveyors move the mail to the Auto Induction Stations, which have four stations, one for each Inclined Conveyor.

40.    At each induction area, the address on each mail piece is read by an overhead Bar Code Reader and by an Optical Character Recognition.

41.    Each induction station had a staging area in which clerk employee is located whose task is to manually place the email to the Output Bin Conveyor.

42.    Each Output Bin Conveyor transports the sorted mail to a container, designated to receive the mail for the specific postal office address all over Puerto Rico (around one hundred containers).

43.     The whole APBS conveyor system provided not less than 50 Emergency Stop Buttons, known as E-Stops.

44.     E-Stop devices are used by the employees to stop the APBS machine in situations where the safety of the employees, the mail or the APBS is at safety risk.

45.     The E-stops are designated to stop the runoff of the system in many circumstances such as a jam of the parcels, safety of employees, voltage problems, strange noise of the machines, maintenance, among others.

46.     Employees are trained and instructed by management as well as by the operating and maintenance APBS's manuals of their obligation to stop the APBS when any safety circumstances are present, such as potential damage to the employee, the mail or to the machine itself.

47.     Many times before plaintiff was terminated, the APBS had been stopped by employees, due to safety concerns.

48.     On July 28, 2022, the conveyor belt (LMS) was out of service, so the mail could not be loaded into the LMS to be transported mechanically into the inclined conveyors.

49.     Management assigned four employees to manually take out the parcels and bags from the yellow sacks and load them directly into each of the four inclined belts, so the parcels and bags could be transported to their respective staging areas of the clerks at the induction area of the APBS.

50.     In an average day, the yellow sacks that are filled up to be transported in the APBS machine exceeds 50 yellow bags per employee.

51.     Nevertheless, a safety concern was present for the employees working at the APBS on said July 28, 2022.

52.     Part of the LMS conveyor runs through the middle of the room with a height of around 5 feet 5 inches. The inclined belts are below the LMS belt.

53.     So, to reach the inclined belts, the employees needed to bend their bodies under the LMS belt to place the parcels in each inclined belt.

54.     It was evident that the employees could, at any time, miscalculate the distance between their head and the LMS ceiling and hit the LMS belt with their heads. Additionally, the low ceiling prevented the employees from maintaining a straight back when lifting parcels that can weigh up to 70 pounds, so there was a risk to an injury to the employees' backs, necks, legs and arms.

55.     Also, there was debris falling from the elevated conveyor onto the employees' heads.

56.     Another safety issue was that the LMS belt had hard edges, some of which were with protective padding that were added to mitigate the risk of head injury.

57.     Prior to July 28, 2022, several employees had been injured while working under and around the APBS that frequently had problems with the LMS as admitted by management.

58.     Defendant and the stewards were aware of such safety concerns, so it was obvious that the manual operation of the APBS represented a serious safety concern that was authentic and substantiated.

59. On July 28, 2022, out of the four employees working under the LMS, two were mail handlers while the other two were postal support employees (PSE).

60. Plaintiff Quero was the shop steward for the two postal support employees that were bargaining union's employees of the APWU PRAL 1070.

61. On the other hand, Juan Pablo Lanza-Pomales (steward Lanza) was the shop steward for mail handlers' employees in representation of the National Postal Mail Handlers Union (NPMHU).

62. Plaintiff Quero was working under Code 607 known as Union Time or Business which is the electronic equivalent to PS Form 7020, called Authorized Absence for Work Room Floor.

63. Steward Lanza was also working on Union Time or Business.

64. Plaintiff and Lanza are similarly situated employees for all legal requirements of a retaliation caused of action.

65. On July 28, 2022, plaintiff and steward Lanza started their Tour 3 at 7:00am.

66. At some point in time on July 28, 2022, steward Lanza, as well as plaintiff, told management, represented by SDO Luis Sánchez, that it was unsafe to have employees working under the LMS. The stewards asked SDO Sánchez if the LMS conveyor belt could be raised to reduce the risk of injury. Management denied the request.

67. Additionally, steward Lanza asked for personal protective equipment such as hardhats (called PPE), but SDO Sánchez said there were no helmets available.

68.     Steward Lanza continued his opposition to the actions of the employer when he raised a crossing craft issue because the USPS was utilizing PSE's employees to complete mail handler's duties.

69.     Plaintiff told SDO Sánchez that the PSE employees were clerks and had not been trained to work as mail handlers.

70.     Steward Lanza notified supervisor SDO Sánchez that his union will wait one day to give the USPS an opportunity to fix the LMS conveyor belt and, thus, resolve the issue. Plaintiff expressed his agreement to steward Lanza's statement.

71.     Management was advised by Lanza that if the situation was not resolved by the next day (July 29, 2022), the union was entitled to take measures to solve the safety concerns.

72.     SDO Sánchez agreed to fix the situation the next day.

73.     Notwithstanding, on July 29, 2022, the conveyor belt (LMS) was still broken and out of service.

74.     On the night of July 29, 2022's night, plaintiff and well as Steward Lanza started their respective Tour 3 time at 7:00 pm. Both were working, again, on Union Time or Business.

75.     On July 29, 2022, management, through SDO Bonilla assigned, again, four (4) employees to work under the LMS, under the same dangerous conditions as the day before.

76.     Two of the four employees were PSE employees known as Antonio Otero and Christopher Romero. They were the same employees that were working at the APBS machine on the day before.

77.     The other two employees were mail handlers represented by Lanza.

10

78.     Plaintiff, as well as steward Lanza, arrived at the APBS shortly after 8:30 pm and noticed that there were four employees working under the same dangerous condition as the day before.

79.     Both Lanza and plaintiff agreed that, due to management continued violation of the safety of the employees, it was necessary to stop the APBS to protect the employees and, additionally, to avoid disciplinary actions against them, had they ordered the employees to disobey the orders of their supervisor by abandoning the work area.

80.     The emergency stop button was pushed by Lanza and the APBS was stopped temporarily.

81.     Many times, before July 29, 2022, and many times after July 29, 2022, several and different employees had pushed the emergency stop button of the APBS and management had not filed any administrative actions or procedures against the employees.

82.     Mail handlers' employees need to stop the APBS machine to replace wire-cages among many other situations where the emergency button stop is pushed by employees, such as the APBS was making strange noises.

83.     For example, on August 04, 2022, just 6 days after July 29, 2022, employee Victor Rosario stopped the machine by pushing the stop button since about 8 Gaylords (pallets) were not in its place and parcels were falling to the floor.

84.     On August 04, 2022, after acknowledging that the APBS machine had been stopped, SDO Bonilla approached employee Victor Rosario and asked Rosario the reason why he had stopped the APBS.

85.    Rosario explained the safety issue concerning the Gaylords or pallets and that he had pushed the E stop for safety reasons.

86.    SDO Bonilla did not discipline Rosario, even though Rosario admitted that he had stopped the APBS.

87.    Rosario is similarly situated to plaintiff but did not have prior EEO's activity.

88.    On July 29, 2022, Steward Lanza provided the four employees with PS Form 1767 to file a Report of Hazard, Unsafe Condition or Practice.

89.    This Form 1767 has the purpose of reporting on any unsafe condition or practice with can cause harm at the working place. Once the form is notified to management, the employer is obligated to fix the safety situation.

90.    The reason why steward Lanza and plaintiff wanted the employees to fill in Form 1767 was to submit the forms to Bonilla to resolve the issue forthwith.

91.    Had Bonilla not solved the situation forthwith, plaintiff, as well as Lanza, had the obligation to file a grievance forthwith against Bonilla.

92.    While the employees were filing out PS Form 1767, very few minutes after 8:30 pm, SDO Bonilla arrived at APBS station area and asked what had happened. Steward Lanza and plaintiff, briefly, explained to SDO Bonilla the safety issue. Bonilla asked both the plaintiff and Lanza to pass by his office. SDO Bonilla asked the PSE Clerks employees to go to his office.

93.    SDO Bonilla did not ask the mail handlers' employees to also go to his office.

94.    Steward Lanza, the plaintiff and the two PSE employees arrived at SDO Bonilla's office. Immediately, the PSE's employees started to complete the filing of the PS 1767 Form.

95.     Five minutes later, Bonilla entered his office, received the PS 1767 Forms from the employees and sent them for a break.

96.     The issue pertaining to the safety condition was discussed by SDO Bonilla, the plaintiff and steward Lanza for several minutes.

97.     The plaintiff informed SDO Bonilla that he and steward Lanza had allowed employees to continue working under the LMS on July 28, 2022, on good faith that management would repair the LMS conveyor belt by the next day. Since management had failed to repair the conveyor belt, steward Lanza did not have any other option than to stop the machine because the employees were reluctant to leave their working station because they could be disciplined by management.

98.     Concurrently with the above referred to meeting, SDO Sanchez worked to restart the machine which was restarted 15 minutes after it was stopped.

99.     At the meeting, SDO Bonilla never requested or ordered the plaintiff and Lanza to voluntarily abandon the postal premises.

100.    This is a common standard petition prior to calling the Postal Police.

101.    Notwithstanding, around 9:15 pm, SDO Bonilla contacted the Postal Police Office and requested them to come to his office. Steward Lanza and the plaintiff were still present at SDO Bonilla's office.

102.    At 9:30 pm, two (2) postal police officers arrived at SDO Bonilla's office. SDO Bonilla told both plaintiff and steward Lanza that he was placing both in Emergency Placement,

requested to tender their respective postal identification and the timecard. Finally, he ordered both stewards to leave the premises.

103.    The postal police officers escorted both steward Lanza and the plaintiff to their respective vehicles and watched them until they left the premises.

104.    On July 28, 2022, SDO Bonilla with MDO Rivera concurring, placed both steward Lanza and plaintiff, on Emergency Placement, effective July 29 at 9:50 PM through August 3 at 7:00 pm. The reason given by management for such disciplinary action was "conduct encouraging a work stoppage".

105.    The plaintiff was shocked by Bonilla's decision because it was obvious that he was acting according to his rights as a shop steward and its special immunity granted by the Labor Relations Board Act.

106.    The emergency stoppage was not intentional nor willful, but to protect employees' safety and health. Bonilla was fully aware that the reason the stewards had to stop the APBS was for employee's safety.

107.     On August 3, both steward Lanza and plaintiff returned to work.

108.    During the period between his placement on Emergency Placement until the time he returned to work on August 3, 2022, plaintiff suffered serious mental health and emotional damages being on the verge of been dismissed.

109.    Such sentiment did not abandon plaintiff's soul and mind even though he was allowed to return to work.

110.    On August 12, 2022, SDO Bonilla held a pre disciplinary interview (PDI) with steward Lanza.

111.    On August 18, 2022, SDO Bonilla held a pre disciplinary interview (PDI) with plaintiff.

112.    The two PSE employees were interviewed by management, and they gave contradictory statements about what had occurred on July 29, 2022.

113.    Nevertheless, the two mail handlers' employees were never interviewed by management. Evidently, those two mail handlers' employees had personal knowledge of the events that took place on July 29, 2022.

114.    On September 9, SDO Bonilla, with MDO Rivera concurring, issued the plaintiff a Notice of Removal for Improper Conduct alleging that plaintiff had pushed the emergency stop button on the APBS causing a work stoppage.

115.    Bonilla alleged that the removal was proper because plaintiff had violated Sections 665.11, 665.13, 667.17 and 667.332 of the Employment Labor Manual (ELM) of the USPS.

116.    ELM Section 665.11 Loyalty reads "Employees are expected to be loyal to the United States government and uphold the policies and regulations of the Postal Service".

117.    ELM Section 665.13 Discharge of Duties read "Employees are expected to discharge their assigned duties conscientiously and effectively".

118.    ELM Section 667.17 Obstructing the Mail reads "title 18 U.S.C. provides penalties for persons **who knowingly and willful** obstruct and retard the mail. The statute does not afford employees immunity from arrest for violations of law". (Our emphasis)

119.    Finally, ELM Section 667.332 states that "Users will be held accountable for damage to postal property caused by negligence or intentionally destructive acts".

120.    The removal was issued, even though plaintiff had no prior disciplinary action during his term of 11 years as a full-time regular employee.

121.    Steward Lanza also instructed employees to stop working and no notice of removal was issued to him.

122.    In the Notice of Removal, SDO Bonilla stated that the reason to remove plaintiff was that employees Otero and Romero claimed that the plaintiff had stopped the APBS machine.

123.    Notably, this assertion is not entirely true, as only PSE Romero indicated that plaintiff stopped the machine. In PSE Otero Otero's statement, he stated that "they - referring to the plaintiff and steward Lanza – "proceeded to stop the APBS and instructed us to go to management's office."

124.    SDO Bonilla used the testimony of PSE Romero to base his decision to terminate plaintiff. even though his statement was never given under penalty of perjury. Steward Lanza never stated that it was the plaintiff that stopped the machine; The plaintiff repeatedly denied that he had stopped the machine.

125.    There is no evidence that SDO Bonilla interviewed the two mail handlers' employees. Up to this point, management had failed to explain why it neglected to collect statements from other employees, or if they were interviewed, why it neglected to include such statements in the case file.

126.    During his PDI interview, the plaintiff repeatedly denied pushing the emergency button.

127.    SDO Bonilla was not a fact witness as to who pushed the emergency button.

128.    At the time of the removal, SDO Bonilla had conflicting testimonies as to whom of the two, Steward Lanza or plaintiff, had physically pushed one the emergency button of the APBS.

129.    The truth is that Bonilla knew that both steward Lanza and plaintiff had acted in common concert and had agreed that the correct way to end the employees' safety concerns was by stopping the APBS.

130.    On September 15, 2022, SDO Bonilla, with MDO Rivera concurring, issued steward Lanza a Notice of 14-day suspension **with no time off** for improper conduct when he instructed employees to stop working on July 29, 2022.

131.    Steward Lanza was not removed from his employment even though he was the steward that pushed the emergency button.

132.    When Bonilla and Rivera issued the 14-day suspension to Lanza, neither of them had knowledge of Lanza of any EEO's prior activity of steward Lanza against any of them.

133.    Nevertheless, when Bonilla issued the Notice of Removal to the plaintiff, he had acknowledged that plaintiff had prior various EEO activity.

134.    As a matter of fact, Bonilla had testified that plaintiff utilized his prior EEO's activities **to intimidate** the supervisors which is the equivalent to say to **intimidate him.**

135.    Not entirely satisfied with the decision to remove the plaintiff from his employment, Bonilla and Rivera instigated a case at the Office of Inspector General (OIG) to file criminal charges against the plaintiff.

136.    On September 16, 2022, Special Agent Pablo Velázquez, from the OIG office, sent plaintiff a text message stating "this message serves as a citation to appear at our office on Monday September 19, 2022."

137.    The meeting was rescheduled for September 21, 2022, due to the passing of Hurricane Fiona.

138.    On said September 21, 2022, plaintiff and his lawyer arrived at the OIG offices located in Metro Office Park. They were ordered to turn off the cellular phones.

139.    Present were Special Agent Pablo Velázquez and another Special Agent called Carlos Rodríguez.

140.    Velázquez and Rodríguez are **Criminal** OIG Inspectors.

141.    Both showed their ID to OIG' special agents. Special Agent Velázquez gave the plaintiff a yellow piece of paper titled Miranda Rights and read the whole document to the plaintiff. Plaintiff 's lawyer asked the reason for plaintiff's had been subpoena and Velázquez told him that someone had filed a complaint against the plaintiff within the District Attorney Office and that criminal charges against the plaintiff were going to be file very soon.

142.    The plaintiff was devastated by the accusation and suffered very serious mental and emotional stress. He cried for months.

143.    Questions were posed to plaintiff regarding the incidents of July 28 and July 29, 2022.

144.    Criminal Inspector Velázquez ended the meeting telling the plaintiff that once criminal charges were filed against him, he will call his attorney to coordinate the criminal process.

145.    Plaintiff was devastated by the affirmation he was going to be criminal charged.

146.    No criminal charges had ever been filed against the plaintiff.

147.    On the other hand, and regarding his illegal termination, on September 15, 2022, plaintiff filed a grievance disputing the removal (USPS Case 1C-21C-1C-CD-2240421; APWU Case 22-3627).

148.    No agreement was reached by the parties during Step 1 and 2 of the process so, on November 01, 2022, the Union asked for arbitration.

149.    The arbitrator that entertained the arbitration evidentiary hearing was Joseph Harris, who held hearings on February 09 and 10, 2023 respectively.

150.    During the arbitration process, management contended that it had just cause to terminate plaintiff's employment for his actions on July 29, which caused a work stoppage stating that, such action, was egregious enough to warrant dismissal despite plaintiff eleven years of service and clean disciplinary record.

151.    The Union raised the disparate treatment defense, among other defenses, because management treated plaintiff and Lanza differently even though both acted alike, with the intention to stop the machine in order to preserve the safety of the employees.

152.    On March 03, 2023, the arbitrator entered the arbitration award.

153.    It is summarized as follows:

The grievance is upheld. Management imposed **disparate treatment** when it terminated the Grievant for essentially the same conduct as that of Steward Lanza-Pomales, who received a two-week (no time off) suspension. It also failed to acknowledge and consider its own failure to maintain safe working conditions, including providing an adequate number of PPE, per Article 18. The NOR shall be reduced to a 14-Day (No Time Off) Suspension, and the Grievant shall be made whole. (Our emphasize)

154.    So, the plaintiff prevailed in his grievance, so plaintiff's removal was unjust and unfair.

155.     The USPS is obliged by the award to make plaintiff whole but up today, USPS has not made plaintiff whole, so plaintiff's damages continue to increase.

156.    On the other hand, regarding EEO case 1C-331-0367-22, on March 23, 2023, the USPS rendered its final decision in EEO 1C-331-0367-22.

157.    Regarding issue number 5 (on September 9, 2022, plaintiff was issued a Notice of removal), the USPS determined that the plaintiff met his burden to establish a prima facie case of discrimination.

158.    Notwithstanding, the USPS' EEO office concluded, erroneously, that USPS proffered a nondiscriminatory reason for the removal consisting in plaintiff's violation of the ELM articles above referred to when plaintiff turned off the machine by pushing the emergency stop button.

159.    So, defendant dismissed EEO 1C-331-0367-22 alleging that plaintiff failed to demonstrate that the reason given by management to terminate him was a pretext for discrimination.

160.    Pushing of the emergency stop button is not prohibited by USPS standards, rules, and regulations.

161.    Plaintiff did not push the emergency stop button.

162.    As a matter of fact, the APBS machine had been temporarily stopped by pushing the emergency stop button many times before July 29, 2022.

163.    No disciplinary action was taken by management against the employees that temporarily had stopped the APBS machine.

164.    Even, argued that the plaintiff did push the emergency button, this action does not amount to an ELM contract violation, nor does it warrant plaintiff's removal.

165.    Management has yet to adopt or enact a specific policy or regulation indicating 1) under what situations the APBS emergency button is to be used by management or by a steward or by an employee to stop the machine, and 2) what the appropriate punishment is for a manager, union steward or employee, who uses the emergency stop function when in violation of number 1.

166.    The use of the stop emergency button is appropriate to protect the employee from being injured or incapacitated while positioned close to the conveyor belt.

167.    Management proffered nondiscriminatory action fails because plaintiff was not the firs person to push the emergency stop button, and even if he did, does not constitute a violation of the rules and regulations of employment.

168.    The proffered nondiscriminatory action was not only pre-textual, but it was a pretext for discrimination.

169.    Plaintiff actions were not meaningfully distinguishable from those of steward Lanza.

170.    In Steward Lanza emergency placement document, management determined that the **two stewards** worked in **lockstep** to stop the APBS and discourage employees from continuing to work underneath the APBS.

171.    Both stewards, plaintiff and Lanza, adamantly maintained that they acted within their contractual right and responsibility to protect the wellbeing of employees who, in their determination, were being asked to work in unsafe conditions.

172.    On September 11, 2021, management provided a Notice of Removal to a one-year employee named Jean Ruiz for intentionally sabotaging a machine because he was tired.

173.    Mr. Ruiz admitted he has no excuse for his actions.

174.    In the instant case, the evidence shows that Quero acted with no such ulterior motive or intention as to Ruiz and was justified in his actions.

175.    Quero was similarly terminated from employment.

176.    At the time of the removal of Ruiz he had no EEO prior activity

177.    Although plaintiff returned to work on March 22, 2023, he is still waiting to receive his compensation as ordered by the arbitrator.

178.    On March 22, 2023, the plaintiff requested a change of schedule so he cannot encounter Bonilla and Rivera at the workplace.

179.    The change of schedule was granted, so the plaintiff began his tour 3 from 3:00 am to 11:30 am.

180.    At the time, his SDO supervisors were Kris Rodríguez, Julio Medina, Delia Méndez, Israel Pérez, Hector Catalá and James Ares.

181.    Nevertheless, from May 23, 2022, until May 30, 2023, the USPS assigned Bonilla as supervisor of plaintiff on Tour 03.

182.    As expected, from the first day that Bonilla was assigned to supervise plaintiff again, he started a campaign of harassment and discrimination for prior EEO activity against plaintiff by intimidation and harassment by lurking at him continuously.

183.    Accordingly, plaintiff had filed several claims such as Report of Hazard, Unsafe Condition or Practice Form and EEO requesting management to stop the situation, but management had denied his claims failing to the perform proper investigations.

**FIRST CAUSE OF ACTION**

184.    The averments of paragraph 1 to 183 are fully incorporated in this paragraph as if fully transcribed herein.

185.    To establish a prima facie case based on reprisal, plaintiff must show that: (1) he or she engaged in prior protected activity; (2) the agency official who took the adverse employment action was aware of the protected activity; (3) he or she was subsequently disadvantaged by an adverse employment action or adverse treatment; and (4) there is a causal link between the protected activity and adverse action/treatment. Hochstadt v. Worcester Foundation for Experimental Biology, Inc., 425 F. Supp. 318, 324 (D. Mass 1976), aff'd 545 F.2d 222 (1st Cir. 1976); Anastacia D. v. Dep't of Justice, EEOC Appeal No.2019002640 (June 30,2020) citing Whitmire v. Dep't of the Air Force, EEOC Appeal No. 01A00340 (September 25, 2000)

186.    Prior activity may be established by participating at any stage of the EEO process or opposing unlawful discriminatory conduct. See, generally, <u>Lewis v. Department of the Navy</u>, EEOC Appeal No. 01810158 (May 22, 1981) (counseling stage); <u>Ballard v. U.S. Postal Service</u>, EEOC Appeal No. 01923276 (August 17, 1992) (witness); and <u>Burrough v. U.S. Postal Service</u>, EEOC Appeal No. 01842417 (June 24,1986) (representative).

187.    To establish the first element of a prima facie case of retaliation, the plaintiff must show the plaintiff has previously engaged in or participated in some form of protected EEO activity.

188.    The evidence shows that the plaintiff had pursued nine (9) prior EEO cases. with dozens of amendments (PRE's).  Consequently, the plaintiff has fulfilled the first element of a prima facie case of retaliation.

189.    The second element of the prima facie case of retaliation requires the plaintiff to demonstrate that the management official knew of the complainant's EEO activity at the time he or she acted against the complainant's employment interests.

190.    SDO Bonilla admitted during the management investigation of plaintiff's EEO that he had knowledge of plaintiff prior EEO activity. As a matter of fact, SDO Bonilla testified that plaintiff's prior EEO activities were pursued by plaintiff to intimidate him.

191.    As to MDO Rivera, he was included in six (6) of the nine prior EEO's filed by plaintiff, so he had full knowledge of plaintiff prior EEO activity.

192.    So, the plaintiff has fulfilled the second element of his prima facie case.

193.    The third element of the prima facie case obliges the plaintiff to show that, after the prior EEO activity was commenced, a subsequent management action adversely affected a term, condition, or privilege of plaintiff's employment.

194.    Plaintiff was removed or terminated from his employment after his EEO activity, which is the ultimate and most adverse employment action altering plaintiff employment conditions.

195.    So, the plaintiff has also fulfilled the third element of his prima facie case.

196.    Even if the plaintiff pushed the emergency button, his action did not amount to an ELM violation nor warrant termination.

197.    The last element necessary for the establishment of a prima facie case of retaliation is evidence of a causal link between the protected activity and the adverse action or treatment received by the complainant.

198.    The causal connection may be inferred by evidence that the protected conduct was closely followed by the adverse action.

199.    The time proximity between the exercise of the protected activity and the adverse employment action was very close.

200.    Plaintiff most recent case 4G-006-0040 -22 was closed on June 27, 2023, and the removal of plaintiff took place on September 09, 2022, less than three months after the closing of the case.

201.    Additionally, plaintiff EEO 1C-331-0367-22 was filed on July 28, 2022, and was pending of resolution when plaintiff was removed from his employment on September 9, 2022, just **41 days** after the filing of EEO 1C-331-0367-22.

202.    Accordingly, a causal connection based on temporal proximity can be established in this case meaning that plaintiff has fulfilled the fourth element of the prima facie case.

203.    Moreover, plaintiff and steward Lanza are similarly situated. Both are full-time regular employees, subjected to the same job standards, engaged in the same conduct and worked on the same shift or tour. Their SDO was Bonilla and the MDO was Rivera. Additionally, both were shop stewards.

204.    Both plaintiff and steward Lanza were subject to the same code of conduct, similar time periods, job functions and standards.

205.    Nevertheless, the two similarly situated employees were treated differently.

206.    The plaintiff suffered retaliation as a result of engaging in the protected activity of filing an EEO claim, and management was aware of the filing of the claim.

207.    The management staff were employed by the USPS; therefore, are considered agents of the USPS.

208.    As agents and employees of the USPS, liability of the concerned management staff is imputed to the USPS.

209.    Therefore, the USPS and its management staff engaged an illegal act of retaliation against the plaintiff.

## SECOND CAUSE OF ACTION:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

210.  Antecedent paragraphs are hereby incorporated as if transcribed herein.

211.    The defendant, through its employees and agents acted intentionally or recklessly by singling out the plaintiff for termination.

212.    By engaging in an illegal act of retaliation, terminating the plaintiff, singling out the plaintiff for termination even though another employee had engaged in the same action, and by engaging in intentional efforts to characterize the plaintiff as criminal, illegal or otherwise warranting the reading of Miranda rights, the defendant acted in an extreme and outrageous act or pattern of activities resulting in extreme emotional distress and physical, mental and emotional harm to the plaintiff.

213.  The plaintiff was responsible for the safety of his fellow employees.

214.  The actions of the defendant were not justified.

215.    The plaintiff suffered damages including severe emotional distress due to the defendant's actions, which were the cause of the plaintiff's severe emotional distress.

## THIRD CAUSE OF ACTION:  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

216.  Antecedent paragraphs are hereby incorporated as if transcribed herein.

217.    Plaintiff was terminated from his employment even though he spent that salary to maintain his family, pay his debts and enjoy life.

218.    Plaintiff was deprived from his source of income for which he suffered an economic disaster.

219.    The plaintiff was unable to pay some of his debts resulting in loss of credit and credit cards and commencement of collection proceedings.

220.    The plaintiff requested a loan to pay for his outstanding debts but same was denied due to his low credit points.

221.    The illegal termination created in plaintiff a desperate feeling of unease, desperation and impotency.

222.    The illegal termination cost plaintiff long hours of cry, disbelief, sadness, lack of sleep and continuous quarrels with his wife.

223.    The plaintiff's condition worsened to the point he had to see medical treatment for his worsened mental condition.

224.     The plaintiff suffered physical pain, physical symptomology, and other impacts upon his physical health.

225.    The stress and emotional trauma of being illegally terminated, implicated in a criminal activity, or labeled as a disruptive employee were proximate cause of the plaintiff's physical harm.

226.  As a result of defendant's actions, defendant is liable to the plaintiff his injuries.

## FOURTH CAUSE OF ACTION:  RETALIATION ACT 115 ( 29 L.P.R.A.

## ∮194) OF PUERTO RICO LAW

227.   Antecedent paragraphs are hereby incorporated as if transcribed herein.

228.   Plaintiff filed complaint EEO 4G-00600040-22, EEO 4G 006-0004-22) and Form 1767 to protect the illegal acts of the defendant as well as dangerous working conditions.

229.   Puerto Rico law prohibits retaliation, threats, termination, or discrimination against the Plaintiff for filing these claims.

230.   All claims were filed in a legislative, administrative or judicial forum in Puerto Rico.

231.   The defendant violated Puerto Rico law for engaging in acts to threaten, intimidate, discriminate against, and ultimately terminate the plaintiff because of these expressions, information, or testimony.

232.   As a result, the defendant is liable to the plaintiff.

**DAMAGES:**

233.   Antecedent paragraphs are hereby incorporated as if transcribed herein.

234.   As a result of defendant discriminatory practices, plaintiff had suffered extensive economic and mental and emotional damages.

235.   Plaintiff was terminated from his employment when he was married being the father of a 7th year old girl while his wife was pregnant with his second child that was born on October 19, 2022, a little more than one month of his termination.

29

236.    Prior to his termination, plaintiff and his wife had lost two pregnancies, so plaintiff made a supreme effort not to affect his spouse's general health and unborn child.

237.  His salary at the date of termination was $ 58,183.00 annually.

238.  He spent that salary to maintain his family, pay his debts and enjoy life.

239.    Plaintiff was deprived of an important source of income. His wife earned also a very good salary but any way, plaintiff suffered an economic slowdown he had to endure. He was unable to pay some of his debts.

240.    Due to plaintiff's inability to pay some of his debts, the bank threw to loss his credit card debt and started collections procedures.

241.  So, the plaintiff lost his credit score that went down to 497.

242.    Plaintiff requested a loan to pay for his outstanding debts but same was denied due to his low credit points.

243.    Additionally, the illegal termination and retaliation created in plaintiff a desperate feeling of unease, desperation, and impotency.

244.    The illegal termination and retaliation cost plaintiff long hours of cry, disbelief, sadness, lack of sleep and continuous quarrels with his wife.

245.  Plaintiff realized several efforts to find a new job to no avail.

246.    The plaintiff's prior psychiatrist's condition was major depressive disorder, obsessive compulsive disorder, panic disorder, bulimia nervosa among others.

247.    As a result of his termination plaintiff's medical condition worsened, and he had to receive additional and different medical treatment.

248.    The dosis of Fluoxetime, an anti-depressive medication, was increased from 20mg to 40mg. Xanax was changed to Clonazepam.

249.    The damages suffered by plaintiff as result of his illegal termination are evaluated in ONE MILLION DOLLARS ($1,000,000.00)

250.  Plaintiff requests trial by jury

251.    Plaintiff request payment of attorney's fees in an amount equivalent to 25% of his damages as well as reasonable expenses of the litigation.

WHEREFORE, it is very respectfully requested from this Honorable Court to grant plaintiff complaint and enter judgment accordingly.

It is hereby certified that on this date, the undersigned counsel electronically filed this motion for extension of time with thew Clerk of the Court using the CM/ECF system, which will send notification of such filing to defendant attorney of record.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 12 of June, 2023.

*S/ MARCOS VALLS SANCHEZ*
U.S.D.C. 203806
Attorney for Plaintiff
PO Box 363641 San Juan, P.R.
00936-3641
(787) 922-8400
marcos.valls@vallslegalfirm.com